GRIGGS v. VILLAGE OF RED JACKET.

1. BILLS AND NOTES—CHECK—INDORSEMENT—EQUITY — RIGHT TO
POSSESSION — MUNICIPAL CORPORATIONS — FORFEITURE — BONA
FIDE HOLDER.

Complainant and two associates entered into an arrangement
with a village to erect a gas plant. As an earnest of their
intentions complainant drew a certified check which one of
his associates deposited with the village clerk. Later a fran-
chise was granted to the promoters by the village providing
for a bond of $1,000 to secure the performance of the pro-
visions of such franchise, in lieu of which bond the parties
agreed to treat the check as security. Failing to obtain nec-
essary financial aid, the promoters abandoned their efforts
and complainant wrote to the clerk for the check, which that
official refused to deliver to him until the mayor and coun-
cil directed. At a later time one of the complainant's asso-
ciates who had caused the check to be deposited with the
village clerk requested the village to order the certified check
indorsed over to a creditor of his own. The council com-
plied with his request, and complainant filed a bill to restrain
the indorsee's bank, which had cashed the check, from collect-
ing it, and to obtain possession of the instrument. No action
had been taken by the village to forfeit the $1,000. The
bank claimed to have received the check for collection only.
*Held*, that neither it nor the indorsee to whom the village
transferred it were holders in due course, and that complain-
ant was entitled to possession.

2. MUNICIPAL CORPORATIONS—TREASURER — INDORSEMENT — STAT-
UTES.

The treasurer of a village is the custodian of its funds, etc. (1
Comp. Laws, § 2731), but has no authority to indorse over to
a third party a certified check deposited to secure perform-
ance of a contract or franchise.

Appeal from Oakland; Erskine, J., presiding. Sub-
mitted April 4, 1912. (Docket No. 30.) Decided July
11, 1912.

Bill by Albert G. Griggs against the village of Red
Jacket and others for an injunction and other relief.

From a decree for defendants, complainant appeals. Reversed.

*Lillis & Hymers* and *George A. Safford,* for complainant.

*P. H. O'Brien, W. J. Galbraith,* and *W. J. MacDonald,* for defendants.

The complainant and J. W. Martin and George F. Brondige made an agreement, under and according to which Martin was to go to Calumet, Mich., and procure, if possible, a gas franchise in Calumet and Lake Linden, the expenses of the adventure to be borne equally by the three, and the profits, if any, to be divided equally. Later a fourth person became a party to the agreement. The community known generally as Calumet is in fact three separate municipal bodies, including the village of Red Jacket, the village of Laurium, and a part of the township of Calumet. While negotiations for a franchise in Red Jacket were pending, and to meet a query made by some of the officers of the village as to the financial ability of Mr. Martin and his friends, the complainant drew, had certified, and delivered to Mr. Martin, who, in turn, delivered it to the village clerk of Red Jacket, a check for $1,000, in words and figures as follows:

"ROCHESTER, MICH., Sept. 28, 1904.
"The Bank of Rochester, Unincorporated. Burr and Newberry, Bankers. Pay to the order of the village of Red Jacket $1,000.00 one thousand dollars.
[Signed]      "ALBERT G. GRIGGS.
"Certified, Burr & Newberry, Sept. 28, 1904."

The record of the proceedings of the common council of Red Jacket of the meeting held October 4, 1904, contains the following:

"A rider to the gas franchise of J. W. Martin relative to flat rate of $1.25 per 1,000 cubic feet, together with a certified check for $1,000 on the Bank of Rochester, Mich., was presented.

"Motion by Wickstrom that rider be attached to franchise, and that certified check be placed in the hands of the village clerk, until and pending the action on the franchise. Carried."

November 1, 1904, a franchise was granted to Joseph W. Martin, his associates, successors, or assigns. By its terms the ordinance was to take effect upon the filing with the clerk within 90 days of a bond in the sum of $1,000 and the acceptance of the grantee thereof in writing, and, if the acceptance and bond were not filed within 90 days, the ordinance was to become void and of no effect. It contained also the following:

"SEC. 2. The said grantee, or his associates, successors or assigns, shall begin the work of laying the gas mains and pipes in said village May first, after the date of the filing of the acceptance of this ordinance by the grantee, as hereinafter provided, and September 1st, after the filing of such acceptance, shall have completed and in operation a system furnishing gas as herein contemplated, to an extent sufficient to supply both sides of Fifth, Sixth, Oak and Pine streets therein, and in case said work is not begun within said time, or shall not be completed to the extent aforesaid and within the time above limited, all rights hereunder shall be forfeited and all the privileges hereby conferred shall cease, unless the common council shall by resolution extend such limitations. And the said grantee, his associates, successors or assigns, shall file with the clerk of said village, at the time of filing his acceptance of this ordinance, a bond in the sum of one thousand dollars ($1,000) to the said village of Red Jacket, with sufficient sureties to be approved by the council, conditioned that they will commence and complete said work to be performed as above, within the time to be specified in this section."

"SEC. 11. All the requirements and obligations upon the grantee, his associates, successors or assigns, by this ordinance are made conditions hereof, for breach of any of which all rights conferred by this ordinance may be forfeited by the said common council, provided that such forfeiture shall not take place if within ninety (90) days after notice given by or under the direction of said common council to said grantee, his associates, successors or assigns, they shall comply with the conditions or terms or

perform such obligations for breach of which, or default in which such notice is given."

December 24, 1904, Mr. Martin sent a communication to the mayor and common council, reading:

"I hereby accept gas ordinance granted me by your Hon. body, and you hold our certified check of $1,000 (one thousand dollars), which we agree to forfeit to the village of Red Jacket if we do not live up to every letter of said gas ordinance."

The communication was signed, "Joseph W. Martin."

Later Martin indorsed his acceptance upon a copy of the ordinance, which also bore the signature of the village by its proper officers.   November 7, 1905, Mr. Martin requested an amendment extending the time for beginning the work until May 1, 1906, and for the completion of the system until September 1, 1906.   The request was refused. October 11, 1905, the complainant wrote to the clerk of the village, and the clerk received a letter in which he states, in substance, that it was impossible, for reasons which are mentioned, to successfully finance the deal; that he is assured that the council did not intend to "hold any one up in this matter," and asks a return of the certified check in order to release the funds tied up thereby.   The letter contains this sentence:

"You will readily understand that the depositing of the check could scarcely be termed a compliance with the terms of the franchise, and as I wish to secure the release of the funds represented by the check, I make the above request."

The clerk answered this letter, promising to take the matter up with the mayor, and saying that some action of the council would be necessary before the request could be complied with.   On October 19, 1905, Mr. Martin wrote to the mayor and common council of the village of Red Jacket, requesting that they make no disposition of the $1,000 certified check—

"Deposited as a guarantee in the gas matter of the

Copper Range Gas Company, until such time as the question is fully settled in Calumet. I supposed that check was put in good faith & want it to stay there & it may be that in the near future your Hon. body will secure for your constituents that which you and they have tried so hard for—an up to date gas plant, with a reasonable rate. Trusting these lines will meet your entire approval, I am."

Again, July 9, 1907, Martin wrote to the president of the village of Red Jacket a letter reciting the fact that the council held a certified check that he deposited with the village clerk for $1,000, that the plant was not built, but that he saved the Calumet people many dollars by the low rate which his hard work made it possible for the community to get; that, if his associates had done as they agreed, he would have built the plant. He then requested the Red Jacket common council to indorse the certified check in favor of Mr. John R. Ryan, " and with the low rate for gas that the village has in the face of what they were about to pay for & Mr. John R. Ryan paid in full I feel that only justice will be done." The check was later delivered to John R. Ryan, with the following indorsement:

" Pay to the order of John R. Ryan, Calumet, Mich.— Village of Red Jacket, per N. F. Kaiser, Village Clerk."

Mr. Ryan deposited it August 14, 1907, with other checks and cash in the National Bank of Calumet, and it appears that he checked against his account an amount sufficient to withdraw from the bank the credit balance thus created, and his checks were paid. In the usual course of business the certified check was forwarded for collection, payment was refused by the certifying bank, and the check was returned to the First National Bank of Calumet. Complainant, the drawer of the check, filed his bill in the circuit court for the county of Oakland, in chancery, naming as defendants the village of Red Jacket, John R. Ryan, Charles A. Burr, Arthur F. Newberry, copartners as the Bank of Rochester, praying, among other things, that he be decreed to be the owner of and

entitled to the possession of the check, that it be ordered delivered up to him to be canceled, that the defendants the village of Red Jacket and John R. Ryan be restrained from attempting to collect, assign, negotiate, or dispose of the said certified check, and that Burr and Newberry be enjoined from paying the same to any person other than complainant. Later, the bill of complaint was amended by making the First National Bank of Calumet a party defendant. Each of said defendants answered the bill. No defendant asks for affirmative relief against complainant or against any other defendant.

It is asserted in the answer of defendant Ryan that the village of Red Jacket indorsed the check and delivered it to him upon the written order of Joseph W. Martin, who was the person who deposited it with the village. He proceeds to set out the facts concerning an indebtedness due and owing to him from said Martin, amounting to upwards of $800, to pay which, he alleges, the check was transferred to him. He negotiated the check, he says, to the First National Bank of Calumet in due course of business; the amount thereof being placed to his credit by the said bank and withdrawn by him. The answer of the village of Red Jacket, signed by its solicitor, also asserts that the check was transferred to Ryan upon the written order of Martin, who had deposited the check; that complainant had no transactions with the village. The First National Bank of Calumet claimed in its answer that it was the lawful holder and owner of the check, that it bought it of Ryan, and paid him for it, in due course of business. It appears that in February, 1906, Mr. Ryan, formerly, and when the franchise was granted, president of the village, wrote to complainant, stating that the council had decided to keep the thousand dollars, but suggesting that he might be able to get the check from the village, pay the indebtedness of Martin to himself, and turn the balance over to Griggs. Complainant did not consent to this. When the check was turned over to Ryan, he gave a receipt to the village, hereinafter set out, and the village

clerk wrote Martin, advising him that the check had been turned over to Ryan, and that the check had been forfeited for failure to comply with the conditions of the franchise. It is said that the action on the part of the clerk was authorized at an informal meeting of the council held in August, 1907, of which meeting no record was made. The receipt was spread upon the minutes of the council at a meeting held September 3, 1907, and on October 1st following, at a regular meeting of the council, these minutes, as the record indicates, were read and approved. The record made in the council proceedings of September 3d was the following:

"Assignment of the $1,000 certified check deposited by J. W. Martin, *et al.* to J. R. Ryan, the action of the village clerk pertaining to the assignment of the $1,000 certified check, and as noticed in the following receipt was declared ratified and approved:

" 'CALUMET, MICH., Aug. 13, 1907.

" 'Received of the village of Red Jacket, Mich., certified check on the Bank of Rochester, Unincorporated, Burr and Newberry, Bankers, in the sum of one thousand dollars ($1,000.00), dated at Rochester, Mich., September 28th, 1904, signed by Albert G. Griggs, and made payable to the village of Red Jacket, and bearing certificate as follows: "Certified, Burr and Newberry, Bankers, September 28, 1904." '

" Said above-described check was indorsed as follows:

" 'Pay to the order of John R. Ryan, Calumet, Mich. Village of Red Jacket, per N. F. Kaiser, Village Clerk.'

"This certified check was made payable to John R. Ryan at the instance of Joseph W. Martin, of Detroit, Mich., in letter of said Joseph W. Martin, dated July 9th, 1907, on file in the village of Red Jacket clerk's office, and is the identical check deposited with the village clerk of the village of Red Jacket by the said Joseph W. Martin as a guarantee of good faith in the matter of complying with the conditions of a certain gas franchise granted to the said Joseph W. Martin by the village of Red Jacket on the 1st day of November, 1904, and which said check was forfeited for failure of the said Jos. W. Martin, to comply with the conditions of said franchise.

    [Signed]     "JOHN R. RYAN, Calumet, Mich."

This record was not made by order of the council. No motion was made, no resolution passed, concerning it. The court below found that it was the understanding that the check should be held by the village in lieu of a bond; that Ryan was not a bona fide holder of the check, having taken it for an antecedent indebtedness; that the First National Bank of Calumet had no knowledge of the purpose for which the check was given, but claimed to have received it for collection only, which fact and the age of the check were sufficient to put the bank upon inquiry; that the turning of the check over to Ryan was unauthorized; and that no formal action was taken by the village to forfeit the check. But the court was of opinion that the village was entitled as against complainant to hold the check as stipulated damages for nonperformance of the franchise obligations, and that its action in indorsing the check to Ryan could not be questioned by complainant, a nonresident of the village, and not a taxpayer therein. It was suggested by the court that the answers be amended so as to lay the ground for such a defense. Accordingly the village amended its answer, asserting therein the right of the village to hold said check as liquidated damages for failure of the franchise grantee to comply with terms of the franchise. The bank and Ryan also amended their answers. A decree was entered dismissing the bill of complaint.

Aside from the question of the *bona fides* of the First National Bank of Calumet, the position of defendants is well stated in the brief filed for all of them, as follows:

"Of the action of the clerk in turning the check over to John R. Ryan, Joseph W. Martin had due notice. Before the clerk turned the check over to Mr. Ryan, he was ordered to do so at an informal meeting of the council at which the president and all the council were present. They all acquiesced in this course, and at the next regular meeting, which occurred on the 3d of September, 1905, the action of the clerk in turning the check over to Mr. Ryan was fully ratified and affirmed. So, if any affirmative action of the council was necessary, such action was

had. It may have been irregular, but, if it was irregular, Mr. Griggs has no right to complain in regard to it. If the check was forfeited, it makes no difference to him what the details were about the manner in which the council affirmatively took action looking toward declaring the check actually forfeited. However, we contend that all of the circumstances demonstrate that the village of Red Jacket accepted and retained the check in the same spirit and for the same purposes for which it was deposited—in lieu of a bond. We further contend that the check was automatically forfeited by the failure on the part of the complainant and his associates to construct the plant, and that whether the village of Red Jacket collected the check and turned the money into the treasury or turned the check over to Mr. Ryan is a matter in which the complainant is not concerned. Nor does the fact that the council immediatedly acted upon an order given by Martin detract in any way from the strength of this position. If the council for its own protection acted in pursuance of an order from Martin, the person by whom the check was deposited, rather than upon its own legal right (at least as against Griggs) as the owner of a forfeited check, it does not follow that the complainant can take advantage of this course on the part of the village. The village of Red Jacket was not bound at its peril to determine whether the check was actually forfeited. If the council was willing that the defendant Ryan should have the check in payment of Martin's indebtedness to Ryan, it was an element of additional safety, as far as the village was concerned, to depend, not only upon the forfeiture of the check, but also upon the order of Martin. In any event, the complainant is in no position to complain of the action of the council. He saw fit to have his check certified and placed in the hands of his agent, whom he said had full authority to represent him. He cannot complain if his agent was able to secure with a forfeited check the payment of an indebtedness incurred in and about the promotion of the enterprise. The check was properly forfeited as liquidated damages on account of the failure of the grantee, Joseph W. Martin, to perform the conditions of the grant."

OSTRANDER, J. (*after stating the facts*). It is immaterial, in the view I take of the case, whether there was or was not a mutual understanding of the village and

the grantees of the franchise that the certified check was to be left with and held by the village in lieu of, or in the place of, the bond which the ordinance required to be given. If the check was not so received and so relied upon, it should have been returned to the maker upon his request. If it was so received, the right of the village was to forfeit it and collect it. Perhaps an authorized attempt to collect it would be sufficient evidence of an intention to forfeit it to the village. This question, however, is not for determination. Assuming that the village had the right to forfeit the check as liquidated damages, it has not done so, and more than six years has elapsed since its right accrued. The check is not in the possession or control of the village. Clearly, the common council would have no right to give the check away by formal or informal action, whether it belonged to the village or to complainant. I reject, as unsupported, the claim that any one supposed that Mr. Martin had the right to use the check to pay his private debt to Mr. Ryan. Complainant, the drawer of the check, was known to Ryan and to the village authorities as a person interested in the gas franchise. He was one of the associates of Martin. The check was drawn and certified to be held by the payee thereof for a special purpose. Martin was never a transferee of the check. It is clear that Mr. Ryan knew all of the circumstances. He had asked complainant, the drawer of the check, to consent to have it used to pay Martin's debt. The village authorities had been requested by the drawer of the check to return it to him. They were informed by Martin that he wished the aid and co-operation of the village to pay his debt to Ryan. He received such aid and co-operation; Ryan being active in that behalf, and the beneficiary thereof.

The First National Bank of Calumet received the check with notice that it had been drawn and certified for three years, was payable to a municipal corporation, and was indorsed by the clerk of the municipality. The clerk of the village had no general power to transfer checks, cer-

tified or other, payable to the village. The treasurer of the village is the custodian of its money and evidences of value. 1 Comp. Laws, §§ 2731–2738. The question is not whether there was *mala fides* in accepting a check, apparently good, properly transferred. It is whether the payee of the check appeared to have indorsed it. The authority of the clerk to make the indorsement was not apparent, and did not, in fact, exist. Beyond this, there is testimony strongly tending to prove that the bank took the check for collection, relying upon the indorsement of Ryan and his responsibility, and did not take it as a transferee, for value. I conclude there are no innocent transferees of the check whose rights are to be protected.

We have then this situation: No party in interest, excepting the complainant, seeks affirmative relief. The check, the subject-matter of the controversy, is held by one who has no right as against any one but Ryan to collect it. Complainant created the fund to pay the check, which he drew and deposited for a special purpose with the village authorities. The check has been wrongfully diverted. Either the village or the complainant is entitled to its possession and to the fund created to pay it. The village has never claimed it, has taken no steps to forfeit it. Not only has it not forfeited it, but upon this record, by its original answer, it disclaimed ownership, and by its amended answer has declined to ask for any relief. I do not mean to intimate that the action of the clerk and councilmen which has been referred to was sufficient to divest the village of its property, if it claimed the check as property. But the last statement from the village in its answer and the argument made in its behalf are calculated only to perpetuate a fraud upon either the village or the complainant. The extent to which the answers of the village, signed only by its solicitor, may be held binding upon the village, is not discussed in the briefs, and I shall not consider the proposition. The village is not in possession of the check. It does not appear that it ever will have the possession and control of it.

I do not agree to the conclusion reached by the learned trial judge that complainant has in any event no interest in the check and the fund evidenced by it. He had the right to have the check and fund used for the purpose for which the check was made and deposited. When he filed his bill, it appeared that it had been diverted, and that the village had never asserted the right to keep it as its own. The village does not now assert the right to have the check restored to it and to then proceed to forfeit it and to recover its damages. It declines, upon this record, to pursue the check or the fund. Under the circumstances, I see but one course to pursue, which is to grant complainant the relief prayed for in his bill, leaving the village to its remedy against those who participated in the diversion of its property.

The decree below is reversed, and a decree will be entered in this court for complainant, with costs of both courts.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, and STONE, JJ., concurred. BLAIR and BIRD, JJ., did not sit.